**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

**Order Filed on September 14, 2020
by Clerk,
U.S. Bankruptcy Court
District of New Jersey**

| | |
|---|---|
| In re: | : |
| | :       CHAPTER 11 |
| CONRAD WISSEL IV AND | : |
| TINA WISSEL, | : |
| Debtors. | : |
| | :       CASE NO.:    18-25812 (SLM) |
| | : |
| | : |
| CONRAD WISSEL IV AND | : |
| TINA WISSEL, | : |
| Plaintiffs, | :       ADV. NO.:    18-01500 (SLM) |
| v. | : |
| | : |
| DEUTSCHE BANK NATIONAL | : |
| TRUST COMPANY, | : |
| Defendant. | : |

**OPINION ON PARTIAL SUMMARY JUDGMENT**

**APPEARANCES:**

Jenny R. Kasen, Esq.
Kasen & Kasen PC
1874 E. Marlton Pike
Suite 3
Cherry Hill, NJ 08003

Douglas J. McDonough, Esq.
Frenkel Lambert Weiss Weisman & Gordon, LLP
80 West Main Street
Suite 460
West Orange, NJ 07052

**STACEY L. MEISEL, UNITED STATES BANKRUPTCY JUDGE**

## INTRODUCTION

This case requires the Court to decide the reach of Chapter 11's anti-modification provision, 11 U.S.C. § 1123(b)(5), and the appropriate application of two Third Circuit decisions, *In re Ferandos*[1] and *In re Scarborough.* [2] These decisions addressed facts similar to those at issue here. But, they interpreted a statute that has since changed significantly. To resolve the current dispute, this Court interprets § 1123(b)(5)—along with the defined terms in 11 U.S.C. §§ 101(13A) and 101(27B)—using the plain language approach mandated by *Ferandos* and *Scarborough*.[3]

In 2004, Debtors Conrad and Tina Wissel executed a mortgage as security for a loan that the Creditor, Deutsche Bank, later acquired. The Wissels, now in Chapter 11 proceedings, assert that the value of their home has declined significantly. They ask the Court to bifurcate the Creditor's claim and cram down the secured portion to the value of the real property. The Wissels argue that cram down is appropriate because, when they applied for the mortgage in 2004, they posted collateral—their home—which was both their principal residence and their principal place of business. Relying on the Third Circuit's decision in *Scarborough,* the Debtors allege that any collateral that is not exclusively used as a principal residence is not subject to the modification protection of § 1123(b)(5).

---

[1] *In re Ferandos*, 402 F.3d 147 (3d Cir. 2005).

[2] *In re Scarborough*, 461 F.3d 406 (3d Cir. 2006). *Ferandos* and *Scarborough* analyzed Chapter 13's anti-modification provision. Despite this case requiring an interpretation of § 1123(b)(5), this Court finds *Ferandos* and *Scarborough* binding because "with the addition of [1123(b)(5)], Congress sought to 'conform[] the treatment of residential mortgages in [C]hapter 11 to that in [C]hapter 13.'" *Scarborough*, 461 F.3d at 413 (quoting H.R.Rep. No. 835 at 46 (1994)). The language in § 1123(b)(5) replicates the language of § 1322(b)(2). Therefore, the analysis remains the same.

[3] *Ferandos*, 402 F.3d at 152 ("On the several occasions that we have had the opportunity to apply to § 1322(b)(2), we have focused on the plain language of the section….); *Scarborough,* 461 F.3d at 411 (quoting the previous excerpt from *Ferandos*.)

2

The Wissels' argument is a faithful application of *Scarborough*.  It would be correct if Congress had not stepped in to make changes.  But, Congress intervened to add definitions to the Bankruptcy Code that the Third Circuit did not analyze when making its decisions.  After the debtors in *Scarborough* filed for bankruptcy, the changes that Congress made to the Bankruptcy Code became effective, and the changes clarified the scope of § 1123(b)(5).  Specifically, Congress added formal definitions of "debtor's principal residence" and "incidental property."  In *Scarborough*, the Third Circuit noted that these changes were enacted but not effective at the time the debtors filed for bankruptcy.  As such, the Third Circuit decided to "leave for another day the question of whether, or how, [the changes] altered the scope of the anti-modification provision."[4]

Accepting this invitation, the Court holds that the definitions Congress added to the Bankruptcy Code plainly extend the reach of § 1123(b)(5).  Read with the textual approach of *Ferandos* and *Scarborough*, Chapter 11's anti-modification provision now includes a mortgage secured by any property that the debtor uses as a principal residence, as defined by § 101(13A), as well by as any incidental property, as defined by § 101(27B).  Deutsche Bank's mortgage satisfies these requirements and is entitled to § 1123(b)(5)'s protection.  Therefore, the Debtors' motion for partial summary judgment is DENIED.

## JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of Reference from the United States District Court for the District of New Jersey dated July 23, 1984 and amended September 18, 2012.  This matter constitutes a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (K), as it involves the administration of the estate and a determination of the validity, extent, or priority of a lien, respectively.  Venue is proper

---

[4] *Scarborough*, 461 F.3d at 412 n. 2.

under 28 U.S.C. § 1409. Pursuant to Federal Rule of Bankruptcy Procedure 7052, the Court issues the following findings of fact and conclusions of law.

## FACTUAL AND PROCEDURAL BACKGROUND

Debtors Conrad and Tina Wissel (the "**Wissels**" or "**Debtors**") purchased the property at the center of this dispute—955 Lawrence Ave., Westfield, New Jersey 07090 (the "**Westfield Property**")—in 1998, executing a mortgage to do so.[5]   On November 2, 2000, the Wissels incorporated Spacia, a business that offered interior and exterior design advice, and sold home furnishings sourced from vendors or manufactured by Spacia itself.[6]

### The Operation of Spacia, Inc., and the 2004 Refinancing

According to Debtor Conrad Wissel, the Debtors operated Spacia on the Westfield Property from 2003 to 2006, renovating the interior in order to showcase the business and market Spacia's products.[7] Debtor Conrad Wissel claims that the Wissels used various areas—including the living and dining rooms, kitchen, and outdoor space—"for product display, photo shoots, meeting with customers, product testing and launch events."[8] He also attests that Spacia had "dedicated space" in an "office/library" area with typical office supplies, as well as a workshop with work benches and tools in the Westfield Property's garage.[9]

Asserting these facts, the Debtors claim that Spacia was operational on the Westfield Property in 2004 when they applied for and received a new mortgage.[10]   According to a loan application attached to Conrad Wissel's certification (the "**Loan Application**"),[11] in December of

---

[5] Adv. Pro. Docket No. 14-2 at 2; Adv. Pro.  Docket No. 14-10 at 2.  Neither party briefed the chronology of the Wissels' pre-2004 mortgages on the Westfield Property nor is it relevant to the Court's decision in this case, which concerns the Wissels' December 2004 refinance.
[6] Adv. Pro. Docket No. 14-3 at ¶ 7, 9.
[7] *Id.* at ¶16, 17.
[8] *Id.*
[9] Adv. Pro. Docket No. 14-3 at ¶ 12, 13.
[10] *Id.* at ¶ 16, 17.
[11] Adv. Pro. Docket No. 14-10.

2004 the Wissels sought a new loan of $1,365,000, of which $1,192,473 was designated to refinance a mortgage executed in 1999 and held by Washington Mutual.[12]  The Wissels would receive a total of $144,562 in cash.[13]  The Loan Application showed Conrad Wissel as the designated Borrower and Tina Wissel as the Co-Borrower.[14]  It stated that the Westfield Property had a market value of $2,100,000.[15]

The Loan Application required the Wissels to make various declarations about their finances and the nature of the Westfield Property, which—as is typical in a refinancing—would serve as collateral for the new mortgage.[16]  In at least two places on the Loan Application, the Wissels asserted, by checking a box, that they intended to use the Westfield Property as their "primary residence."[17]  The Debtors could have instead indicated, by checking other boxes, that the Westfield Property would be their "Secondary Residence" or an "Investment," but chose not

---

[12] Adv. Pro. Docket No. 14-10 at 4, 6.  Also deducted from loan proceeds, according to the Loan Application, were "estimated prepaid items" of $6,447 and "estimated closing costs" of $21,517.  In 2004, according to the Loan Application, the property was encumbered by two mortgages: the first was held by Washington Mutual and had $1,192,473 outstanding and the second was held by Commerce Bank with $150,000 outstanding.  Adv. Pro. Docket No. 14-10 at 3.

[13] Adv. Pro. Docket No. 14-10 at 4.

[14] *Id*. at 6.

[15] *Id*. Deutsche Bank attacks the relevance of this Loan Application, noting that it is signed by an Andrew Huber of First U.S. Mortgage Corporation and that there is no certification that Mr. Huber worked for Washington Mutual or supplied it with the Wissels' information.  Adv. Pro. Docket No. 26 at 6.
 It appears the Debtors also met with Huber for a face-to-face interview during the mortgage process.  *Id*. However, the Wissels' mortgage agreement with Washington Mutual is signed not by Mr. Huber but by Lena Hutchinson, who identifies herself in the title area with her signature as an assistant vice president at Washington Mutual.  Adv. Pro. Docket No. 14-5 at 7.  The mortgages reflected in the Loan Application and the Washington Mutual Agreement, respectively, have the same amount ($1,365,000), interest rate (1.25%), and term (360 months).  The Loan Application is stamped at the footer of each page as "Freddie Mac Form 65" and "Fannie Mae Form 1003," and appears to be the then-current version of the *Uniform Residential Loan Application*.  Interestingly, Debtors assert that the Loan Application was actually produced to them by Deutsche Bank during the discovery period of this litigation.  Adv. Pro. Docket No. 30 at 4.

[16] The Wissels reported monthly mortgage payments totaling $9,070.  Adv. Pro. Docket No. 14-10 at 3.  They also reported monthly payments to Chase Auto and to various charge accounts.  *Id.*  And they reported ownership of real estate located on Park Avenue in New York City.  *Id.* at 4.

[17] *Id.* at 2, 4.

to do so.[18] In a third location on the Loan Application, the Wissels certified that they owned an interest in a property that was a "principal residence" within the previous three years.[19]

Where the Loan Application requested employment information, Conrad Wissel indicated that he was self-employed at two companies, Spacia and Impressions Software.[20]  He said that he worked at Spacia for four years.[21]  He listed the Westfield Property as the address for both companies.[22]  The Wissels also reported monthly rental income of $2,369, but did not indicate its origin.[23]  At oral argument, the Debtors conceded that Spacia did not pay the rental income listed on the Loan Application and confirmed that Spacia never paid any rent.[24]

On December 8, 2004, the Wissels executed a note in favor of Washington Mutual for $1,365,000.[25]   In return, Washington Mutual secured a new mortgage (the "**Creditor's 2004 Mortgage**") on the Westfield Property.[26]   The underlying mortgage agreement (the "**2004 Mortgage Agreement**") provided the following:

> Borrower does hereby mortgage, grant, and convey to Lender the following described property located in Union County, New Jersey… which currently has the address of 955 Lawrence Avenue, Westfield, New Jersey 07090…TOGETHER WITH all the improvements now or hereafter a part of the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument.[27]

---

[18] *Id*. at 2.
[19] *Id*. at 4.
[20] Adv. Pro. Docket No. 14-10 at 2.
[21] *Id*.
[22] *Id*.
[23] *Id*. at 3
[24] Sept. 12, 2019 Hearing at 10:58:16, Adv. Pro. Docket No. 33.
[25] Adv. Pro. Docket 14-5 at 2.
[26] *Id*.
[27] Adv. Pro. Docket No. 14-6 at 10.

The Wissels also agreed to make certain payments into an escrow fund for insurance and taxes.[28] On May 12, 2010, Washington Mutual assigned the note and the Creditor's 2004 Mortgage to Deutsche Bank ("**Deutsche Bank**" or "**Creditor**").[29]

### The Bankruptcy Case

On August 7, 2018, the Wissels filed a joint voluntary petition under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").[30]  They filed their schedules on September 13, stating that they operate another business—Pure Couture, Inc., d/b/a/ Couture 9—out of the Westfield Property.[31]  They also indicated that they have an equitable or legal interest in Spacia and Impressions Software, but that the entities are not operational.[32]  They also filed a request for the opportunity to participate in the Court's Loss Mitigation Program regarding the Creditor's 2004 Mortgage on the Westfield Property.[33]  No one objected to the LMP request.  The Court ordered the Debtors and Creditor to participate in the LMP on September 17, 2018.[34]

---

[28] *Id*. at 17.

[29] *Id*. at 25.

[30] Main Case Docket No. 1.

[31] Main Case Docket No. 22 at 6.

[32] *Id.* at 5.

[33] Shortly after filing for bankruptcy, the Debtors sought to participate in the Court's Loss Mitigation Program ("**LMP**") regarding the mortgage on the Westfield Property.  Main Case Docket No. 16 at 1.  Creditor argues that the Debtors' participation in the LMP estops Debtors from arguing that the Westfield Property was not their principal residence.  Adv. Pro. Docket No. 26 at 14.  The Court need not consider this argument because Debtors eventually conceded that the Westfield Property was in fact their principal residence as defined by 11 U.S.C. § 101(13A).  *See* Adv. Pro. Docket No. 36 at 6.  The relevant facts are that the debtors utilized the Court's mandatory form to request loss mitigation and proposed paying the Creditor adequate protection payments during the loss mitigation period.  *Id.* at 1.  On the form, however, the Wissels crossed out the portion of the certification, which would have attested that the Westfield Property consisted "only of real property in which I hold an interest used as a principal residence."  Main Case Docket No. 16 at 1.  As modified, the form read:

> I understand that if the court orders loss mitigation in this case I am required to comply with the Loss Mitigation Program and Procedures and will participate in good faith.  I understand that Loss Mitigation is voluntary, and that I am not required to enter into any agreement or settlement with any other party as part of this Loss Mitigation, and understand that no other party is required to enter into any agreement or settlement with me.  I also understand that I am not required to request dismissal of this case as part of any resolution or settlement that is offered or agreed to during the Loss Mitigation Period. *Id.*

[34] Main Case Docket No. 26.

**The Debtors Seek to Cram Down Creditor's Mortgage**

On October 2, 2018, the Debtors filed an adversary complaint.[35]  The complaint asks the Court to determine the validity and extent of Creditor's 2004 Mortgage against the Westfield Property pursuant to 11 U.S.C. §§ 506(a) and 1123(b)(5).[36]  The adversary complaint alleges, among other things, that at the time of loan origination the Debtors provided Washington Mutual with notice that the Westfield Property was both their principal residence and their principal place of business.[37]  Additionally, the Debtors assert that the Westfield Property now has a fair market value of only $750,000[38]—significantly less than the $2,100,000[39] value at the time they received the Creditor's 2004 Mortgage—and is also subject to a first mortgage in the amount of $150,000.[40]  Because the Debtors argue that the Westfield Property is not covered by the anti-modification provision in § 1123(b)(5), they ask the Court to bifurcate the Creditor's mortgage into two claims: (1) a secured claim that is crammed down to the remaining value of the Westfield Property after subtracting the first mortgage, and (2) an unsecured claim for the amount remaining.[41]

Deutsche Bank answered the Wissels' adversary complaint on November 2, 2018.[42]  The Creditor's answer argues that the Creditor's 2004 Mortgage is in fact protected by § 1123(b)(5)

---

[35] Adv. Pro. Docket No. 1.  Shortly after filing the Adversary Complaint, Debtors filed a *Motion to Extend the Exclusive Period During Which the Debtors May File a Chapter 11 Plan and Solicit Acceptances Thereof, Pursuant to 11 U.S.C. § 1121(d)* on November 30, 2018, requesting the Court extend the exclusivity period.  Main Case Docket No. 33.  The motion states that Debtors need additional time to file a disclosure statement and plan because: (1) the Debtors were currently providing their mortgage servicer with documents to supplement the Debtors' application for mortgage assistance through the LMP; and (2) the Debtors commenced the adversary proceeding against the Creditor. *Id.* at ¶ 24-25.  In the motion, Debtors assert that they will not be in a position to file a Chapter 11 plan "[u]ntil the modification/cramdown issue is resolved, either through loss mitigation or through their adversary against Deutsche Bank . . . ." *Id.*
[36] *Id.* at ¶ 1.
[37] *Id.* at ¶ 26.
[38] *Id.* at ¶ 16.
[39] Adv. Pro. Docket No. 14-10 at 4.
[40] *Id.* at 3; Adv. Pro. Docket No. 1 at ¶ 10.
[41] *Id.* at ¶ 27.
[42] Adv. Pro. Docket No. 6.

and asserts eleven affirmative defenses.[43]  Five weeks later, on December 11, 2018, Creditor filed

a proof of claim in the Debtors' Main Case, in the amount of $2,111,751.04.[44]  This proof of

claim—which Creditor later reduced slightly to $2,107,683.85[45]—nevertheless represents the

entire unpaid balance of the mortgage with interest and fees.[46]

The parties attempted to resolve the dispute raised by the Adversary Complaint through

mediation.[47]  They were not successful.[48]

**The Debtors Move for Partial Summary Judgment**

After mediation failed, the Debtors continued with their adversary action and moved for

partial summary judgment.[49]  The partial summary judgment motion contends that, as a matter of

law, the Creditor's 2004 Mortgage is not protected by the anti-modification provision in 11 U.S.C.

§ 1123(b)(5).[50]  In support of their position, Debtors cite *Scarborough*,[51] which they interpret as

holding that collateralized property must "be *only* the debtor's principal residence and *have no

other use*" in order to receive the protections of § 1123(b)(5).[52]  Debtors allege that the Westfield

Property had another use—it was Spacia's principal place of business.  Debtors also contend that

Washington Mutual had both actual and constructive notice of the Debtors' use of the Westfield

Property.[53]  The Debtors primarily rely on the Loan Application, focusing on the fact that it shows

that Conrad Wissel was employed at Spacia, whose listed address was the Westfield Property.[54]

---

[43] *Id.* at 5, ¶ 26; 6, ¶ 1–10.

[44] Claim No. 7-1.

[45] Claim No. 7-2.

[46] Claim No. 7-1 at 4; Claim 7-1 Part 2 at 1.

[47] Adv. Pro. Docket No. 11.

[48] Adv. Pro. Docket No. 13.

[49] Adv. Pro. Docket No. 14.

[50] Adv. Pro. Docket No. 14-2 at 2.

[51] 461 F.3d at 406.

[52] Adv. Pro. Docket No. 14-2 at 8 (emphasis in original); *In re Scarborough*, 461 F.3d 406 (3d Cir. 2006).

[53] Adv. Pro. Docket No. 14-2 at 5–6.

[54] *Id.*  In further support of this argument, Conrad Wissel certified that "[a]t all relevant times during Washington Mutual's loan origination process, my wife and I used the Westfield Property as *both* a principal residence *and* principal place of business wherefrom we generated nearly all of our household income."  Adv. Pro. Docket No. 14-

Deutsche Bank responded by filing opposition to the Debtors' motion for partial summary judgment on August 15, 2019.[55]  Deutsche Bank's opposition maintains that the Creditor's 2004 Mortgage falls squarely within the ambit of § 1123(b)(5) and therefore cannot be modified.[56]  First, Deutsche Bank argues that there is "no doubt" that the Westfield Property is covered by the anti-modification provision as a "principal residence" as that term is defined at 11 U.S.C. § 101(13A).[57]  Second, it denies all of Debtors' factual assertions relating to the Westfield Property's income generation and the notice allegedly given to Washington Mutual.[58]  Third, Deutsche Bank maintains that the Creditor's 2004 Mortgage "is the exact type of loan the anti-modification provision was meant to protect" because the Debtors "repeatedly executed documents evidencing the fact that [the Westfield Property] was their principal residence.[59]

Expanding on this argument, the Creditor avers that the Wissels applied for a residential rather than commercial mortgage.[60]  Deutsche Bank further argues that the legislative history of the anti-modification provision "indicates that it was designed to protect and promote the increased production of homes and to encourage private ownership of homes."[61]  The Creditor's opposition also maintained—in an argument the Creditor later abandoned—that *Scarborough* should be distinguished for two reasons.[62]  First, Creditor asserted that *Scarborough* only addressed a

---

3 at ¶ 5 (emphasis in original).  The Debtors further supported their claim that Spacia operated out of the Westfield Property during the critical period with exhibits.  These included: screenshots of Scandia designs and products (Adv. Pro. Docket No. 14-7, 8); photographs of the Westfield Property (14-7); copies of Scandia invoices to customers spanning from February to August 2004, which list the Westfield Property as Spacia's address (14-9); and a copy of the Loan Application (14-10).

[55] Adv. Pro. Docket No. 26.

[56] *Id*. at 5.

[57] *Id*. at 7.  Section 101(13A) defines "debtor's principal residence" as "a residential structure if used as the principal residence by the debtor, including incidental property, without regard to whether that structure is attached to real property."

[58] *Id*. at 5-7, 9-18.

[59] *Id*. at 11.

[60] *Id*.

[61] *Id*. (quoting *In re Ferandos,* 402 F.3d 147 (3d Cir. 2005)).

[62] Adv. Pro. Docket No. 26 at 9.  "While the plaintiffs would have the Court believe that the case *sub judice* is controlled by the *In re Scarborough*, *supra*, precedent, that case is clearly distinguishable."  After the Court required

residence with multiple living units, while the Westfield Property is a single-unit residence.[63]

Second, Creditor maintained that even if Washington Mutual was aware that Spacia operated out

of the Westfield Property, the Creditor's 2004 Mortgage did not secure any interest in Spacia or

any other business.[64]    Creditor asserted that this fact distinguished it from the lender in

*Scarborough* and protects Creditor's mortgage.[65]

Debtors replied on September 5, 2019.[66]    The reply argues that Deutsche Bank's reading

of *Scarborough* is simply incorrect.[67]    Debtors contend Scarborough stands for the rule that, for

the anti-modification provision to apply, "the collateral at issue must be *only* the debtor's principal

residence at the time of loan origination and *have no other use*."[68]    Additionally, Debtors maintain

that their various factual declarations shifted the burden of production to Creditor.    Debtors assert

that Creditor subsequently failed to undercut Debtors' assertions related to notice and the business

operations at the Westfield Property.[69]    Finally, Debtors argue that because the Creditor's 2004

---

further briefing, Creditor abandoned the argument that *Scarborough* should be distinguished: "[w]hile *Scarborough* itself is still binding precedent, there has been a change in the Bankruptcy Code that directly effects the *Scarborough* analysis." Adv. Pro. Docket No. 35 at 5.

[63] *Id.*

[64] *Id.* at 11

[65] *Id.* Creditor also argues in its opposition that the Wissels are estopped from maintaining that the Westfield Property was not their principal residence due to their participation in the LMP. *Id.* at 14. As discussed *supra,* the Court need not consider the estoppel argument because Debtors eventually conceded that the Westfield Property was in fact their principal residence as defined by § 101(13A) at all relevant times. Adv. Pro. Docket No. 36 at 6. Two official documents are material to the LMP dispute. *See District of New Jersey, Bankruptcy Court, Loss Mitigation Program and Procedures* (amended September 19, 2013); *but see Third Amended General Order Adopting Loss Mitigation Program and Procedures* (effective Dec. 17, 2019) (expanding LMP eligibility to include real property that is not a debtor's principal residence). The Court notes that the Third Amended General LMP Order took effect after the Debtors requested to participate in the LMP. Therefore, following the Third Circuit's lead in *Scarborough,* the Court would consider the language of the LMP manual prior to the 2019 amendment. *See also* Main Case Docket No. 16. As the Court noted before, the Debtors struck language found in the Court's mandatory form when they requested loss mitigation. Specifically, the Debtors amended the mandatory form to reflect that they did not certify the Westfield Property is their principal residence. However, these issues are not relevant to the Court's analysis of § 1123(b)(5).

[66] Adv. Pro. Docket No. 30.

[67] *Id.* at 6 (emphasis in original).

[68] *Id.*

[69] *Id.* at 7, 12; s*ee Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Mortgage was a refinance, Congress's aim of encouraging home ownership through the anti-modification provision has no bearing on the disposition of this dispute.[70]

**The Hearing for Partial Summary Judgment**

The parties appeared before the Court on September 12, 2019, for a hearing on Debtors' motion for partial summary judgment. The Court questioned the Debtors regarding their notice argument. Specifically, the Court asked whether any additional documents existed—aside from the Loan Application, 2004 Mortgage Agreement, and note—that the Debtors rely on to establish that the Westfield Property was multi-purpose.[71] The Debtors replied that they believed there were no other available documents that were relevant. They also stated that Spacia never paid rent to the Debtors and that the Westfield Property was zoned for residential use, not commercial use.[72] Finally, the Court asked whether the Debtors were required to list the Westfield Property with the town of Westfield in order to legally have a tenant.[73] The Debtors' attorney appeared unsure.

The Creditors and the Debtor agreed that *Scarborough* controls the issue of whether the anti-modification provision applies.[74] They also agreed that *Scarborough* includes a bright-line test on the applicability of § 1322 (and, consequently, § 1123).[75] Creditor argued that modification was improper because there was no dispute that Debtors used the Westfield Property as their principal residence and the mortgage at issue took a security interest in a single-structure dwelling.[76] Any business the Debtors operated, according to Creditor, was irrelevant.[77]

---

[70] *Id.* at 14–15.
[71] September 12, 2019 Hearing at 10:30:07, Adv. Pro. Docket No. 33.
[72] *Id.* at 10:57:25, Adv. Pro. Docket No. 33.
[73] *Id.* at 10:57:40.
[74] Creditor previously argued that *Scarborough* should be distinguished.
[75] *Id.* at 11:08:25.
[76] *Id.* at 11:12:31.
[77] *Id.* at 11:51:10.

Neither party, however, was able to address the question of whether the application of *Scarborough* was altered by the addition of the formal definitions of "debtor's principal residence" and "incidental property" in 11 U.S.C. §§ 101(13A) and 101(27B). Congress defined these terms through the Bankruptcy Abuse Prevention and Consumer Protection Act ("**BAPCPA**") and the Bankruptcy Technical Corrections Act ("**BTCA**"), which took effect after the debtor in *Scarborough* filed for bankruptcy.[78]  Indeed, in footnote 2 its opinion, the Third Circuit itself raised the question of whether the outcome of *Scarborough* would be altered by BAPCPA.[79]  Finding this inquiry critical to the disposition of the case, this Court instructed the parties to submit supplemental briefing on the issue.[80]

**The Parties Address the Application of *Scarborough* after BAPCPA and the BTCA**

The Debtors filed their first supplemental brief in response to the Court's questions at oral argument on October 31, 2019.  In the brief, the Wissels reiterate their position that *Scarborough* requires an exclusive-use-only rule, meaning that any mixed-use collateral is outside the ambit of § 1123(b)(5).[81]  The Debtors also cite cases showing that some courts—even after BAPCPA— allowed modification where a principal residence had a mixed use, even if no income was generated.[82]  And the Wissels continue to maintain that Washington Mutual—the Creditor's predecessor-in-interest—had sufficient notice of the Westfield Property's mixed use.[83]

---

[78] Bankruptcy Abuse Prevention and Consumer Protection Act, Pub. L. 109–8, § 306(c) (2005); Bankruptcy Technical Corrections Act of 2010, Pub. L. No. 111–327, 124 Stat. 3557 (2005)).
[79] *Scarborough*, 416 F.3d at 412 n.2.
[80] The Court asked two questions.  First, did the use of the Westfield Property for business purposes fall within the definition of "incidental property" introduced by BAPCPA?  September 12, 2019 Hearing at 11:59:34, Adv. Pro. Docket No. 33.  And second, if the business operations were in fact incidental property, does this impact the Court's determination of the applicability of the anti-modification provision? *Id.*
[81] Adv. Pro. Docket No. 34 at 8.
[82] *Id.* at 10.
[83] *Id.* at 7-9.

Deutsche Bank responded on November 27, 2019, with a brief in further opposition to the Wissels' motion for partial summary judgment.[84]  The new opposition demonstrates a change in the Creditor's position.  It now accepts that *Scarborough* is binding precedent, but argues that "a change in the Bankruptcy Code directly effects the *Scarborough* analysis."[85]  Now, the Creditor's lead argument is that the new definitions of "principal residence" and "incidental property" make clear that modification is improper in this case.[86]  Deutsche Bank states that adding the definition of "debtor's principal residence" from 11 U.S.C. § 101(13A) to the text of § 1123(b)(5) produces the following language: "a plan may [] modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence if used as the principal residence by the debtor." [87]

The Creditor contends that this statutory text requires a decision in its favor because the Debtors conceded in their filings that they have used the Westfield Property as their principal residence since 1998.[88]  It further argues that the word "only" found in § 1123(b)(5) does not modify "principal residence," and that "as long as a residential structure is used as principal residence, it is protected from modification."[89]  Finally, Deutsche Bank maintains that to the extent the Westfield Property's income production is relevant, Debtors "have submitted no evidence to establish that the [Westfield Property] produced any income at all."[90]

The Wissels filed a supplemental reply on December 9, 2019.  They maintain that *Scarborough* requires an exclusive-use-only rule, and that this holding survived the BAPCPA and

---

[84] Adv. Pro. Docket No. 35.
[85] *Id*. at 5.  Previously, Creditor argued that *Scarborough* should be distinguished.  "While the plaintiffs would have the Court believe that the case *sub judice* is controlled by the *In re Scarborough, supra,* precedent, that case is clearly distinguishable." Adv. Pro. Docket No. 26 at 9.
[86] *Id*. at 6.
[87] *Id*.
[88] *Id*. at 7.
[89] *Id*. at 13 (internal quotation marks omitted).
[90] *Id*. at 9.

BTCA amendments.[91]  Additionally, the Debtors attack Deutsche Bank's statutory construction, noting that "the Third Circuit, in *Scarborough*, interpreted the 'only' in § 1123(b)(5), in conjunction with the word 'is,' to mean 'exclusively.'"[92]  While the Debtors again concede in their supplemental reply that they "do not dispute that at all relevant times the property at issue has been used as their 'principal residence,' as defined by 11 U.S.C. § 101(13A)," they conclude that, under *Scarborough*, any mixed-use defeats the anti-modification provision.[93]

The Wissels' argument is a steadfast application of *Scarborough*, which would be correct if Congress had not intervened.  Yet, Congress did step in to make changes to the Bankruptcy Code after the debtors in *Scarborough* filed for bankruptcy.  For the reasons described below, the Court finds that these changes expressly extended § 1123(b)(5) to include collateral that debtors use as their principal residence, as defined by § 101(13A), as well as collateral that is incidental property, as defined by § 101(27B).  Because the Creditor's 2004 Mortgage secures only the debtor's principal residence and incidental property, the Debtors may not bifurcate the Creditor's claim.

## DISCUSSION

### I.   Summary Judgment Standard

This Court can grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[94]  A fact is material if it "might affect the outcome of the suit under the governing law."[95]  An issue of material fact is considered "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."[96]

---

[91] Adv. Pro. Docket No. 36 at 2.
[92] *Id*. citing *Scarborough*, 461 F.3d at 411.
[93] Adv. Pro. Docket No. 36 at 6.
[94] Fed. R. Civ. P. 56(a).
[95] *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).
[96] *Razak,* 951 F.3d at 144 (quoting *Anderson*, 477 U.S. at 248).

At the summary judgment stage, the court must construe facts and inferences in a light most favorable to the non-moving party.[97]  To survive a summary judgment motion, the non-movant "must point to specific factual evidence showing that there is a genuine dispute on a material issue requiring resolution at trial."[98]  Suspicions, conclusory allegations, and bare assertions fail to satisfy the non-movant's burden.[99]  The court may only consider evidence that would be admissible at trial.[100]  Thus, "evidence whose foundation is deficient must be excluded from consideration."[101]

When the movant is the party who bears the burden of proof at trial, a stricter standard exists.[102]  The Third Circuit explains that "where the movants have the burden of proof at trial, 'they [have] the burden of supporting their motion for summary judgment with credible evidence.'"[103]  In this instance, if "the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented."[104]

Finally, when some material facts remain disputed, summary judgment may still be appropriate if the moving party is entitled to judgment as a matter of a law after all inferences are drawn in favor of the non-moving party.[105]

---

[97] *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018).
[98] *Cranmer v. Harleysville Ins. Co.*, 719 F. App'x 95, 98 (3d Cir. 2017) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).
[99] *Jutrowski*, 904 F.3d at 288–89.
[100] *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 471 (3d Cir. 1989).
[101] *Williams*, 891 F.2d at 471.
[102] *Nat'l State Bank v. Bank of N.Y.*, 979 F.2d 1579, 1582 (3d Cir. 1992) (citing *Celotex Corp.*, 477 U.S. at 323–25).
[103] *Foster v. Morris*, 208 F. App'x 174, 179 (3d Cir. 2006) (further citation omitted).
[104] *Foster*, 208 F. App'x at 179 (quoting *Nat'l State Bank*, 979 F.2d at 1582) (further citation omitted).
[105] *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).

## II.     The Third Circuit's Decisions and the Expansion of the Definition of Principal Residence

As the Third Circuit explained in *Scarborough,* pursuant to 11 U.S.C. § 506(a) "the normal rule in bankruptcy is that a claim that is secured by a lien on property is treated as a secured claim 'only to the extent of the value of the property on which the lien is fixed.'" [106]  The Debtors ask the Court to cram down the secured portion of the Creditor's 2004 Mortgage to the Westfield Property's value,[107] leaving the rest of the mortgage unsecured.  The Debtors attest that because the value of their home declined, this is the appropriate relief.[108]

The sticking point is that the Bankruptcy Code's anti-modification provisions[109] serve as exceptions to § 506(a).[110]  Chapter 11's anti-modification provision, § 1123(b)(5), provides that "a plan may [] modify the rights of holders of a secured claim, other than a claim secured only by a security interest in real property that is the debtor's principal residence."[111]  Originally, Congress did not define key terms in this statute—such as "debtor's principal residence" and "incidental property"—instead leaving courts room to fashion their own views.[112]  But this is no longer the case.  In 2005, Congress enacted BAPCPA, defining "debtor's principal residence" in § 101(13A) as "a residential structure, including incidental property, without regard to whether that structure

---

[106] *Scarborough*, 461 F.3d at 410 (quoting *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 239 (1989)); accord *In re Ferandos*, 402 F.3d 147, 151 (3d Cir. 2005) ("the normal treatment of a purportedly secured claim in bankruptcy depends on the value of the collateral, and the claim will be considered to be a secured claim for the amount of the value and [] an unsecured claim for the remainder.")

[107] Adv. Pro. Docket No. 1 at ¶ 27.

[108] Adv. Pro. Docket No. 1 at ¶ 16; Adv. Pro. Docket No. 14-10 at 4.

[109] As the Third Circuit noted in *Scarborough*, "'with the addition of [1123(b)(5)], Congress sought to 'conform[] the treatment of residential mortgages in [C]hapter 11 to that in [C]hapter 13.'"  *Scarborough*, 461 F.3d at 413 (quoting H.R.Rep. No. 835 at 46 (1994)); *accord In re Wages*, 508 B.R. 161, 165 n.6 (B.A.P. 9th Cir. 2014).

[110] *Ferandos*, 402 F.3d at 151.

[111] *See Nobelman v. American Sav. Bank*, 508 U.S. 324, 325-326 (1993) ("The question is whether § 1322(b)(2) prohibits a Chapter 13 debtor from relying on § 506(a) to reduce an undersecured homestead mortgage to the fair market value of the mortgaged residence. We conclude that it does….").

[112] The *Scarborough* court described this landscape in a footnote to its decision, explaining that BAPCPA—which did not apply to the dispute in *Scarborough*, but had been enacted when the Third Circuit heard the appeal—could well change the Circuit's view of the reach of the anti-modification provisions. *Scarborough*, 461 F.3d at 412 n. 2.

is attached to real property."[113]  BAPCPA also provides, in § 101(27B), that "incidental property" includes "all easements, rights, appurtenances, fixtures, rents, royalties, mineral rights, oil or gas rights or profits, water rights, escrow funds, or insurance proceeds; and all replacements or additions."  Finally, in the BTCA, Congress further expanded the definition of "debtor's principal residence" to include "a residential structure if used as the principal residence by the debtor."[114]

While the debtors in *Ferandos* and *Scarborough* filed for bankruptcy before §§ 101(13A) and 101(27B) became effective, the cases nevertheless provide the Court with an interpretive roadmap.  *Ferandos* involved a modification request from a debtor whose mortgage was secured by a principal residence as well as an assignment of rents and an escrow fund for insurance and taxes.[115]  The *Ferandos* case required the Third Circuit to interpret 11 U.S.C. § 1322(b)(2), Chapter 13's twin to § 1123(b)(5).  The Third Circuit applied a "plain language" and "plain meaning" approach through which it "read section 1322(b)(2) to mean what it literally states."[116]  *Ferandos* held that the inclusion of non-real property as additional security for a mortgage would defeat the anti-modification provision.[117]  The Third Circuit held, however, that the mortgage at issue in *Ferandos* was protected because rents are real property under New Jersey law and escrow funds are not additional collateral as they cease to be the borrower's property when placed into escrow.[118]

The next year, the Third Circuit addressed anti-modification once again in *Scarborough*. *Scarborough* concerned a bifurcation request from a debtor whose mortgage was secured by a

---

[113] Pub. L. 109-8, § 306(c), 119 Stat. 23 (2005); 11 U.S.C. § 101(13A).
[114] Pub L. 111-326, § 2(a)(1)(A), 124 Stat. 3557 (2010); 11 U.S.C. § 101(13A).
[115] *Ferandos,* 402 F.3d at 150.
[116] *Id.* at 152, 154.
[117] *Id.* at 155.
[118] *Id.*; s*ee also Hammond v. Commonwealth Mortg. Corp. of Am.,* 27 F.3d 52, 55 (3d Cir. 1994) ("[W]e conclude that a mortgage which creates security interests in a debtor's personal property in addition to a lien on the mortgagor's principal residence takes the mortgage beyond the protection of the anti-modification clause of section 1322(b)(2)….").

multi-unit dwelling where the debtor resided along with a rental tenant.[119]   Echoing *Ferandos*, *Scarborough* held that the evaluation of whether a mortgage exceeds the bounds of the anti-modification turns on the specific terms of the mortgage. [120]   In reaching its decision, the Third Circuit in *Scarborough* again turned to the text of § 1322(b)(2), explaining that legislative history and the contracting parties' collective intent were irrelevant to the issue.[121]   It held that when Congress provided that anti-modification applied to claims "secured only by a security interest in real property that is the debtor's principal residence," it "equated the terms 'real property' and 'principal residence.'"[122]   The Third Circuit explained that "[this] means that the real property that secures the mortgage must *only* be the debtor's principal residence."[123]   *Scarborough* permitted the debtor to bifurcate, holding that the presence of a rental unit meant that the collateralized property was not exclusively the debtor's principal residence.[124]

As a threshold matter, *Scarborough*'*s* categorical rule against mixed-use collateral no longer binds the Court.[125]   BAPCPA introduced a formal definition of "debtor's principal residence" effective for cases commenced after October 17, 2005, which was four years *Scarborough* debtors filed bankruptcy.[126]   Based on the timing, the *Scarborough* court acknowledged that the exclusive-use-only rule reflected an interpretation of the pre-BAPCPA version of the Bankruptcy Code, explaining in a critical footnote that "we leave for another day

---

[119] *Scarborough*, 461 F.3d at 406.
[120] *Id*. ("we have noted that, when considering whether a mortgagee has taken a security interest in any property other than real property, we look to the terms of the mortgage; s*ee Ferandos*, 402 F.3d at 155.")
[121] *Id.* at 411.
[122] *Id.* at 411.
[123] *Id.* (emphasis in original).
[124] *Id.* at 406, 412.
[125] The Court also refers to this holding as "the exclusive-use-only rule."
[126] *In re Scarborough*, Adv. No. 02-058, slip. Op. at 2 (Bankr. E.D. Pa. Oct. 14, 2003).

the question of whether, or how, [BAPCPA] altered the scope of the anti-modification provision . . . ."[127]

Indeed, BAPCPA significantly impacted a key tenet of *Scarborough*'s analysis. While *Scarborough* held that § 1323(b)(2) "equated 'real property' and 'debtor's principal residence'" such that anti-modification only applied to claims "secured only by real property," Congress in BAPCPA defined "debtor's principal residence" and "incidental property" to include both real and personal property. For example, § 101(13A) provides that mobile homes and trailers may qualify as a "debtor's principal residence" "without regard to whether that structure is attached to real property."[128] Additionally, § 101(27B) includes as "incidental property" escrow accounts and insurance proceeds, generally two examples of personal property under state law.[129] These additions represent a clear Congressional statement that "real property" and "debtor's principal residence" are no longer coterminous.

Although Congress determined the statutory definitions, to utilize when applying § 1123(b)(5), this Court remains bound by other aspects of *Ferandos* and *Scarborough*. The Court must begin with a plain language approach, because both *Ferandos* and *Scarborough* held that anti-modification provisions are clear and unambiguous and that their literal meaning controls. Inherent in this textual approach is the maxim that "[i]f the statutory language is clear, then the

---

[127] *Id*. at 412 n. 2. As the Supreme Court has explained, "Congress is free to change this Court's interpretation of its legislation." *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 736 (1977).
[128] 11 U.S.C. § 101(13A)(A)(B).
[129] *See In re Lunger*, 370 B.R. 649, 651 (Bankr. M.D. Pa. 2007) (stating that escrow account is an item of personal property under Pennsylvania law); *see also* Restatement (First) of Property § 8 (1936) (defining personal property as the category of interests in things other than land).

text of the statute is the end of the matter,"[130] as well as the command that the Court "give effect, if possible, to every clause and word of a statute."[131]

### III.    The Creditor's 2004 Mortgage May Not be Modified Under the Express Terms of § 1123(b)(5)

When § 1123(b)(5) is read together with the definition of "debtor's principal residence" in § 101(13A), Congress's command is clear: "a plan may [] modify the rights of holders of secured claims, other than a claim secured only by a security interest in *real property that is the debtor's principal residence... if used as the principal residence by the debtor, including incidental property....*"[132] Evaluating the statutory text by its plain language, as *Ferandos* and *Scarborough* mandate, the standard is explicit: in order to bifurcate the Creditor's 2004 Mortgage, the Debtors must show either that the Westfield Property was not their "principal residence" under § 101(13A), or that the Creditor's 2004 Mortgage was secured by additional items that were not "incidental property" under § 101(27B).  The Court finds that the Debtors cannot make either showing. Instead, the 2004 Mortgage Agreement secured only the Debtor's principal residence—the Westfield Property—and various items of incidental property.  Therefore, § 1123(b)(5) prevents modification of the Creditor's 2004 Mortgage.

#### A.  The Creditor's 2004 Mortgage Secured the Westfield Property, which was the Debtors' Principal Residence Under § 101(13A)

Because § 1123(b)(5) only applies to loans secured by the debtor's principal residence, the Debtors may defeat the provision by showing that the Westfield Property was not their principal residence when the Creditor's 2004 Mortgage was executed. [133]  The Debtors fail to make this

---

[130] *United States v. Jackson*, --- F.3d. ---, 2020 WL 3563995 (3d Cir. 2020) (citing *United States v. Jones,* 471 F.3d 478, 480 (3d Cir. 2006)).

[131] *Jackson*, --- F.3d. ---, 2020 WL 3563995 at *3, (quoting *United States v. Menasche,* 348 U.S. 528, 538-539 (1955)).

[132] 11 U.S.C. §§ 1123(b)(5) and 101(13A) (emphasis added).

[133] *Scarborough*, 461 F.3d at 411.

showing.  In fact, the Debtors concede that at all times relevant to this case, they used the Westfield

Property as their "principal residence" as that term is defined in 11 U.S.C. § 101(13A).[134]  Thus,

even if the Debtors were able to establish that Spacia was active in 2004, the Westfield Property

would still qualify as the "debtor's principal residence" under the plain language of § 101(13A).

The Debtors seek to rely on the "exclusive-use-only" rule to overcome this hurdle, arguing that

because the Westfield Property was not "only" their principal residence, bifurcation is

appropriate.[135]  But, as the Court has already stated, that rule no longer applies and the Debtors

reliance is misplaced.  Based on the additions to the Bankruptcy Code, modification is improper

even if Spacia operated out of the Westfield Property.  Therefore, the inclusion of the Westfield

Property as security does not eliminate the § 1123(b)(5) protection of the Creditor's 2004

Mortgage.

A number of courts analyzing the anti-modification provisions—as amended by BAPCPA

and the BTCA—found that the provisions apply to loans secured by property that the debtors use

as their principal residence, regardless of other uses.[136]  Shortly after the BTCA came into effect,

*In re Schayes* considered a mortgage secured by a property that the debtors claimed they acquired

for investment purposes.[137]  The court found that because the debtors used the home as their

---

[134] Adv. Pro. Docket No. 36 at 6. ("The Wissels do not dispute that at all relevant times the property at issue has been used as their "principal residence," as defined by 11 U.S.C. § 101(13A).")

[135] Adv. Pro. Docket No. 14-2 at 8 (emphasis in original); *In re Scarborough*, 461 F.3d 406 (3d Cir. 2006).

[136] *In re Schayes*, 483 B.R. 209, 213 (Bankr. D. Ariz. 2012); *In re Wages*, 508 B.R. 161, 168 (9th Cir. B.A.P. 2014); *In re Harriman*, 2014 WL 1312103 (Bankr. N.D. Cal. March 31, 2014); *In re Hock*, 571 B.R. 891 (Bankr. S.D. Fl. 2017); *In re Kelly*, 2016 WL 2893984 (Bankr. D.S.C. May 11, 2016) ("This Court agrees with those courts that hold that if the property is the only collateral for a secured creditor's claim and is used as the debtor's principal residence, the mere fact that the property or a portion of the property is used for some other purpose does not preclude the application of the anti-modification provisions in section 1123(b)(5) and section 1322(b)"); *Utzman v. Suntrust Mortgage, Inc.,* 2016 WL 795739 at * 1 (N.D.C.A. March 1, 2016) (holding that § 1123(b)(5) prohibits modification of a property that debtor uses as principal residence and also rents to a tenant); *In re Cady,* 2015 WL 631359 (Bankr. M.D. Fl. Jan. 27, 2015) ("[t]he Court finds that the property is the Debtors' principal residence, even though Mr. Cady also uses the property as a home office for his work as a real estate agent").

[137] *Schayes*, 483 B.R. at 210.

principal residence after closing, § 1123(b)(5) prevented modification.[138]  It concluded that "additional, actual uses have no relevance under the plain language of the Code, so long as there is an actual use as the debtor's principal residence."[139]

*Schayes* is an early example of a line of cases holding that the plain language of the Bankruptcy Code extends the anti-modification provisions to loans secured by mixed-use property, as long as the debtors use the property as their principal residence.  *In re Wages* concerned debtors who operated a trucking business from their home and driveway.[140]  They argued that they should be allowed to bifurcate the mortgage claim because they used their home as both a principal residence and a principal place of business.[141]  The Bankruptcy Appellate Panel for the Ninth Circuit disagreed, holding that § 101(13A)'s definition of "debtor's principal residence" extends the anti-modification provision "to any loan secured by real property that the debtor uses a principle residence property, even if that real property also serves additional purposes."[142]  This plain language analysis has gained traction.  In *In re Harriman,* the court denied a bifurcation request from a debtor who lived in the main house on her mortgaged property and rented out a small cottage, explaining that the *Wages* "interpretation of the anti-modification provision is the most consistent and sensible reading of the statute."[143]  *In re Hock* succinctly summarized this line of cases: "[c]ourts which consider the issue and begin with a statutory analysis of the plain

---

[138] *Id*. at 217.
[139] *Id*. at 216.
[140] *In re Wages*, 508 B.R. 161, 163 (9th Cir. B.A.P. 2014).
[141] *Id*. at 165.
[142] *Id*. at 167.  The *Wages* court criticized the Third Circuit's interpretation of § 1322(b)(2), claiming it "disregard[ed] the bankruptcy code's definition of 'debtor's principal residence' in § 101(13A)."  But as this Court explained *supra,* the Third Circuit did not analyze this definition because the language *Wages* relied upon was not enacted until 2010, which was after the temporal period in *Scarborough* (*i.e.*, the petition date).  The initial definition of "debtor's principal residence"—as enacted through BAPCPA—was not in effect when the debtors in *Scarborough* filed for bankruptcy.  Because BAPCPA did not apply *nunc pro tunc* to existing cases, the Third Circuit was unable to consider its applicability.
[143] *Harriman*, 2014 WL 1312103, at *4.

language tend to reach the same conclusion—that the plain language is unambiguous and that the anti-modification protections thus apply to any loan secured only by real property that the debtor, exclusively or non-exclusively, uses as his principal residence."[144]

Arguing against this current textual interpretation, the Debtors argue that Congress never intended to change the *Scarborough* rule with either BAPCPA or the BTCA. They rely on *In re Jordan*, in which the court determined that BAPCPA did not alter the scope of the anti-modification provision.[145] *Jordan* declared that "the large majority of cases deciding the issue have reached the conclusion that Section 101(13A) . . . did not operate to change pre-BAPCPA law . . . ."[146] But Debtors' reliance on this case is illogical for two reasons. First, *Jordan* never considered the BTCA's expanded definition of "debtor's principal residence" because the BTCA had not yet been enacted.[147] Second, when the mortgage in *Jordan* was executed, there was no residence at all on the secured property.[148] While the Debtors later added a mobile home to the real property, the court—following Third Circuit precedent—held that *Scarborough* required that the loan security be the debtor's principal residence when the loan was originated, not some later date.[149]

The Debtors next turn to *In re Picchi,* wherein the court determined that a loan secured by a mixed-use principal residence could be modified.[150] This case is also inapposite. First, while *Picchi* was decided after the BTCA was enacted, it never considered the amended version of § 101(13A) because the debtors filed their case before the BTCA became effective.[151] Second,

---

[144] *Hock*, 571 B.R. at 895.
[145] *In re Jordan*, 403 B.R. 339, 346 (W.D. Pa. 2009).
[146] *Id*. at 346.
[147] The BTCA was enacted on December 22, 2010. *Jordan* was decided on March 27, 2009.
[148] *Jordan*, 403 B.R. at 346
[149] *Id*. at 354.
[150] *In re Picchi*, 448 B.R. 870 (B.A.P. 1st Cir. 2011).
[151] *Id*. at 872.

*Picchi* relied on the First Circuit's controlling decision in *Lomas Mtg. Inc., v. Lewis,* which—in direct contradiction to *Scarborough*—held that the anti-modification provision was ambiguous and did not allow for a single plain language interpretation.[152]  Just as this Court is bound by the Third Circuit's textual methodology of interpreting the anti-modification provision, the *Picchi* court was required to apply the First Circuit's reasoning, which turned on legislative history. *Picchi*, like Jordan, has no bearing on the current dispute.

Taking cues from *Picchi,* the Wissels nevertheless argue that the legislative history of the BTCA shows that Congress did not intend to enact substantive changes to the Bankruptcy Code with the 2010 legislation.[153]  Indeed, Rep. Lamar Smith, a co-sponsor of the BTCA, explained during floor debate that "[n]o Federal judge should interpret any provision of this bill to confer, modify, or delete any substantive bankruptcy right, nor should anyone infer a congressional intent to alter substantive rights from the bill's attention to one section of the Bankruptcy Code but not the other."[154]  This Court declines the Debtors' request to consider this legislative history because, first and foremost, the statutory text of §§ 1123(b)(5) and 101(13A) is unambiguous, obviating the need for additional interpretive sources.[155]  Further, even if the cited legislative history could establish a unitary Congressional desire to leave substantive bankruptcy rights unaltered, it is not clear which way this intent would cut.  After all, when Congress enacted BAPCPA and the BTCA, the federal courts had not agreed on a single, consistent application of the anti-modification provision.[156]

---

[152] *Lomas Mtg. Inc. v. Lewis*, 82 F.3d 1, 4 (1st Cir. 1996).
[153] Adv. Pro. Docket No. 34 at 14.
[154] 156 Cong. Rec. H7158 (daily ed. Sept. 28, 2010) (statement of Rep. Smith).
[155] *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989) (holding in a Chapter 11 case that "where… the statute's language is plain, the sole function of the courts is to enforce it according to its terms [and] reference to legislative history is hardly necessary.")
[156] *Litton Loan Servicing v. Beamon*, 298 B.R. 508 (N.D. N.Y. 2003) (extending anti-modification provision to property that hosted a business, before BAPCPA and the BTCA); *see also Scarborough,* 461 F.3d at 406 (holding the opposite).

The Debtors' argument presents an additional issue.  Following it renders § 101(13A) nugatory, reading the provision out of the statutory scheme.  The Wissels' preferred reading holds that "commercial mixed-use properties are not subject to the anti-modification provision pursuant to the Third Circuit's 'principal residence only' rule."[157]  The Debtors' spin gives no effect to the text of § 101(13A), which provides that "the term 'debtor's principal residence' [] means a residential structure if used as a principal residence by the debtor."  Indeed, the only way to accept the Debtors' reading is to blatantly ignore the plain language of § 101(13A).  Why would this Court follow such an approach when the Third Circuit even recently reiterated that courts should "give effect, if possible, to every clause and word of a statute?"[158]  Instead, the Court finds that the plain, unambiguous text of §§ 1123(b)(5) and 101(13A) clearly provides that the anti-modification provision applies to mortgages secured by property that the debtors use as their principal residence, regardless of other uses.

Turning to these facts, Court determines that the Westfield Property was the debtors' "principal residence," as defined by § 101(13A).  When the Wissels applied for the Creditor's 2004 Mortgage, they certified in at least two areas of the Loan Application that they intended to use the Westfield Property as their "primary residence."[159]  The Loan Application also provided the Debtors with the option of designating the Westfield Property as a "Secondary Residence" or "Investment."[160]  Furthermore, counsel for the Debtors stated at oral argument that the Westfield Property was zoned for residential use, rather than commercial use.[161]  Indeed, the Debtors themselves eliminated any doubt about their use of the Westfield Property when they conceded in

---

[157] Adv. Pro. Docket No. 36 at 6.
[158] *Jackson*, --- F.3d. ---, 2020 WL 3563995 at *3, (quoting *United States v. Menasche*, 348 U.S. 528, 538-539 (1955));  *see also Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.")
[159] Adv. Pro. Docket No. 14-10 at 2, 4.
[160] *Id*. at 2.
[161] September 12, 2019 Hearing at 10:57:25, Adv. Pro. Docket No. 33.

their final filing that "at all relevant times the property at issue has been used as [our] 'principal residence,' as defined by 11 U.S.C. § 101(13A)."[162]

The original loan for the Westfield Property as collateral, it secured the debtors' principal residence, as defined by § 101(13A).  Under the plain language of the provision, it is irrelevant if the Debtors maintained a business on the Westfield Property during the loan origination process. The statute expressly provides that a "debtor's principal residence" is "a residential structure if used as the principal residence by the debtor."  Unlike in *Scarborough,* the presence of a business has no bearing under the statute's plain language.  For that reason, the Court need not address whether the Debtors provided notice of any business operations on the Westfield Property at the time they received the Creditor's 2004 Mortgage.  Even if the Debtors provided notice, the Westfield Property was still the Debtor's principal residence under § 101(13A).  In this instance, notice no longer matters.  The collateralization of the Debtors' principal residence does not defeat the anti-modification provision.  Accordingly, § 1123(b)(5) prohibits modification of the Creditor's 2004 Mortgage.

The Debtors' only argument left is that the Creditor's 2004 Mortgage secured additional items that were not incidental property.  But argument also fails.

### B. The Creditor's 2004 Mortgage Secured Various Items of Incidental Property, Which Do Not Defeat the Creditor's Anti-Modification Protection

Under the plain terms of § 1123(b)(5), anti-modification protection applies to claims secured "only by a security interest in *real property that is the debtor's principal residence… including incidental property*."[163]  The Court already determined that the Westfield Property, secured by the Creditor's 2004 Mortgage, was the Wissels' principal residence.  Arguably, Debtors

---

[162] Adv. Pro. Docket No. 36 at 6.
[163] 11 U.S.C. §§ 1123(b)(5) and 101(13A) (emphasis added).

could still defeat the anti-modification provision if they demonstrate that the Creditor's 2004 Mortgage secured additional items other than "incidental property," as defined by § 101(27B). The Debtors fail to make this demonstration.  The Court finds that, in addition to the Westfield Property, the Creditor's 2004 Mortgage is secured by six items—improvements, easements, appurtenances, fixtures, escrow funds, and replacements and additions[164]—each falling squarely within the definition of "incidental property" in § 101(27B).[165]  By § 1123(b)(5)'s explicit terms, the securitization of these items cannot be used as an attempt to defeat the Creditor's 2004 Mortgage's anti-modification protection.

In *Ferandos,* the Third Circuit's analysis of whether a mortgage has anti-modification protection required an evaluation of "the effect of the grant in the mortgage instrument, not the actual existence of collateral available later to the creditor."[166]  Similarly, *Scarborough* held that the anti-modification analysis turns on the terms of the mortgage.[167]  Thus, while the parties to the current dispute have argued at length about how much business was actually being done on the Westfield Property in 2004,[168] this debate is largely irrelevant based on the plain statutory language.. Instead, to make sure it is in accord with the Court's decision, the Court focuses on the 2004 Mortgage Agreement.  The 2004 Mortgage Agreement provides:

> Borrower does hereby mortgage, grant, and convey to Lender the
> following described property located in Union County, New Jersey
> . . . which currently has the address of 955 Lawrence Avenue,

---

[164] Adv. Pro. Docket No. 14-6 at 10, 17.

[165] 11 U.S.C. § 101(27B) provides, "[t]he term 'incidental property' means, with respect to a debtor's principal residence—
(a) property commonly conveyed with a principal residence in the area where the real property is located;
(b) all easements, rights, appurtenances, fixtures, rents, royalties, mineral rights, oil or gas rights or profits, water rights, escrow funds, or insurance proceeds; and
(c) all replacements or additions."

[166] *Ferandos,* 402 F.3d at 155 n. 4 (citing *Wilson v. Commonwealth Mortg. Corp.*, 895 F.2d 123, 129 (3d Cir. 1990))

[167] *Scarborough,* 461 F.3d at 412 ("We have noted that, when considering whether a mortgage has taken a security interest in any property other than real property, we look to the terms of the mortgage.")

[168] Briefly, Creditor and Debtor have a sustained disagreement about whether any business income was generated on the Westfield Property by Debtors' Spacia business. Adv. Pro. Docket No. 26, 5-7, 9-18; Adv. Pro. Docket No. 35 at 9.

> Westfield, New Jersey 07090…TOGETHER WITH all the improvements now or hereafter a part of the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument.[169]

The Wissels also agreed to make certain payments into an escrow fund for insurance and taxes.[170]

The definition of incidental property at § 101(27B) embraces, by explicit inclusion, five of the six items collateralized by the 2004 Mortgage Agreement, which grants the lender security interests in "improvements… easements, appurtenances, and fixtures," each of which is identified as "incidental property" in § 101(27B)(B).   The requirement that the Debtors make escrow payments for insurance and taxes is also covered by § 101(27B)'s inclusion of "escrow funds." Notably, even before Congress enacted § 101(27B), *Ferandos* held that such escrow payments do not defeat the anti-modification provision.[171]   Finally, the inclusion of "replacements and additions" as security corresponds directly to § 101(27B)(C), which identifies "replacements and additions" as incidental property.

The term "improvements" does not explicitly appear in § 101(27B), but the Court finds that it, too, represents incidental property.  In *Ferandos*, the Third Circuit considered a mortgage agreement that secured "improvements," among other items.  Evaluating a contractual provision[172] almost identical to the quoted portion of the 2004 Mortgage Agreement, the Third Circuit found that the presence of "improvements" as security did not abrogate the protection of § 1322(b)(2),

---

[169] Adv. Pro. Docket No. 14-6 at 10.

[170] *Id.* at 17.

[171] *Id.* at 150.

[172] *Ferandos* considered the following agreement: "Borrower does hereby mortgage, grant and convey to Lender the following described property located in the Dover Township, New Jersey ... Together with all the improvements now or hereafter erected on the property; and all easements, rights, appurtenances and rents, all of which shall be deemed to be and remain a part of the property covered by this Mortgage…." 402 F.3d at 153.

Chapter 13's anti-modification provision.[173]  *Ferandos* was decided before § 101(27B) became effective, but courts sitting more recently have agreed with its analysis.

In *Birmingham v. PNC Bank*, the Fourth Circuit considered a mortgage agreement that required the borrower to purchase insurance coverage for the property's improvements.[174]  Citing *Ferandos*, the court held that this provision secured "incidental property" and that, as such, Chapter 13's anti-modification applied.[175]  And, in *In re Leblanc*, the court denied bifurcation after it found that a mortgage agreement securing both "improvements" and related insurance proceeds did not exceed the bounds of § 1322(b)(2).[176]

In sum, the 2004 Mortgage Agreement contained a boilerplate provision that secured improvements, easements, appurtenances, fixtures, and replacements and additions, and required the Debtors to make escrow payments. [177]  *Ferandos* held that the inclusion of "improvements" in a mortgage agreement does not disrupt the application of the anti-modification provision.[178]  The remaining items—easements, appurtenances, fixtures, escrow funds, and replacements and additions—are explicitly defined as "incidental property" in § 101(27B).  Therefore, the 2004 Mortgage Agreement secured only the "debtor's principal residence" and "incidental property," and the Creditor's 2004 Mortgage may not be modified.

## IV.    Conclusion

The Third Circuit's decisions in *Ferandos* and *Scarborough* established a plain language approach to interpreting the anti-modification provisions of the Bankruptcy Code.  The Court's

---

[173] *Id*. at 150.
[174] *Birmingham v. PNC Bank*, 846 F.3d 88, 94 (4th Cir. 2017); *see also Donaldson v. Bayview Loan Servicing*, 710 Fed.App'x 588 (4th Cir. 2018) (per curiam); *Jeremy v. J.P. Morgan Chase,* 678 Fed.App'x 178 (4th Cir. 2017) (per curiam).
[175] *Id*. at 90.
[176] *In re Leblanc*, 2009 Bankr. LEXIS 3206 (Bankr. S.D. Fl. July 22, 2009).
[177] Adv. Pro. Docket No. 14-6 at 10, 17.
[178] *Ferandos*, 402 F.3d at 150.

task in this case was simply to apply this methodology to Chapter 11's anti-modification provision found in 11 U.S.C. § 1123(b)(5), along with the formal definitions of "debtor's principal residence" and "incidental property" added by BAPCPA and the BTCA in 11 U.S.C. §§ 101(13A) and 101(27B), respectively. Congress's command in these provisions is clear: "a plan may [] modify the rights of holders of secured claims, other than a claim secured only by a security interest in *real property that is the debtor's principal residence... if used as the principal residence by the debtor, including incidental property.*"[179]  Therefore, in order to bifurcate the Creditor's 2004 Mortgage, the Debtors had the burden of demonstrating either that the Westfield Property was not their "principal residence," or that the 2004 Mortgage secured additional items that were not "incidental property."  The Court concludes that the Debtors failed to make either showing.  The Debtors' motion is DENIED.  An appropriate Order will issue.

Dated: September 14, 2020

Honorable Stacey L. Meisel
United States Bankruptcy Judge

---

[179] 11 U.S.C. §§ 1123(b)(5) and 101(13A) (emphasis added).